**No. 15-2192**
—————————————————————

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**
—————————————————————

QINETIQ U.S. HOLDINGS, INC. & SUBSIDIARIES,
*Petitioner-Appellant*,

v.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent-Appellee.*
—————————————————————

ON APPEAL FROM THE UNITED STATES TAX COURT
—————————————————————

**BRIEF FOR APPELLANT**
**QINETIQ U.S. HOLDINGS, INC. & SUBSIDIARIES**
—————————————————————

Gregory G. Garre
Gerald A. Kafka
Benjamin W. Snyder
Nicolle Nonken Gibbs
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

*Counsel for Petitioner*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-2192__     Caption: __QinetiQ US Holdings, Inc. & Subsidiaries v. Commissioner__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__QinetiQ US Holdings, Inc. & Subsidiaries__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?     ☑ YES ☐ NO
       If yes, identify all parent corporations, including all generations of parent corporations:
       Appellant is a wholly owned subsidiary of QinetiQ Overseas Holdings, Ltd. (a United Kingdom company), which is a wholly owned subsidiary of QinetiQ Holdings, Ltd. (a United Kingdom company), which is a wholly owned subsidiary of QinetiQ Group plc (a public company traded on the London Stock Exchange).

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO
       If yes, identify all such owners:
       No publicly held entity directly owns ten percent or more of Appellant's stock.

08/05/2015 SCC

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☑YES ☐NO
If yes, identify entity and nature of interest:

   The following publicly held corporations have a financial interest in the outcome of the litigation by means of an interest in an insurance policy held by it or by one or more of its subsidiaries: CNA Financial Corporation, Hiscox Ltd, Fairfax Financial Holdings Limited, Novae Group plc, The Hanover Insurance Group Inc., and Hannover Re.

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _s/ Gregory G. Garre_____    Date: ___January 21, 2016___

Counsel for: _QinetiQ US Holdings, Inc. & Subs.___

## CERTIFICATE OF SERVICE
**************************

I certify that on ___January 21, 2016___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_s/ Gregory G. Garre_____    ___January 21, 2016___
(signature)    (date)

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES .........................................................v

STATEMENT OF JURISDICTION................................................1

STATEMENT OF ISSUES .........................................................1

INTRODUCTION ....................................................................2

STATEMENT OF THE CASE...................................................5

    A.    Statutory Background........................................5

    B.    Factual Background...........................................7

          1.    TGH And DTRI ......................................7

          2.    Restrictions Imposed On Employee Stock ................9

          3.    Sale Of DTRI To QinetiQ...............................11

          4.    Tax Reporting Of Stock At Issue..........................13

    C.    Procedural History...........................................14

SUMMARY OF ARGUMENT ...................................................17

STANDARD OF REVIEW .......................................................19

ARGUMENT .......................................................................20

I.    THE NOTICE OF DEFICIENCY MUST BE SET ASIDE BECAUSE
IT FAILS TO MEET A CENTRAL REQUIREMENT OF THE APA........20

    A.    The APA Plainly Applies To The Notice Of Deficiency....................20

    B.    The Notice Of Deficiency At Issue Flunks The APA Because It
Fails To Provide Any Reasoned Explanation .....................................22

    C.    None Of The Other Considerations Cited By The Tax Court
Provides Any Reason For Excusing This Statutory Violation............28

    D.    Because The Notice Of Deficiency Is Invalid Under The APA,
It Must Be Vacated...........................................................33

II.    THE TAX COURT INDEPENDENTLY ERRED IN HOLDING
THAT QINETIQ WAS NOT ENTITLED TO THE DEDUCTION ............34

iii

**Page**

A.   The Stock Clearly Was Transferred In Connection With The
Performance Of Services .......................................................... 35

  1.   Chin's Stock Was Granted At The Time He Signed His
Employment Contract And Was Explicitly Linked To
Chin's Tenure At DTRI ................................................ 36

  2.   Chin's Employment Served As Consideration For The
Stock ............................................................................. 37

  3.   DTRI Intended To Tie Chin's Equity Stake To His
Continued Provision Of Services For The Company .............. 40

B.   The Stock Clearly Was Subject To A Substantial Risk Of
Forfeiture ............................................................................... 42

  1.   The Fact That Chin Treated The Stock As His Own Does
Not Mean That He Was Not At Risk Of Losing It ................. 43

  2.   The Tax Court Clearly Erred In Engaging In A Hindsight
Analysis Of What Risks Were Substantial .............................. 46

CONCLUSION ............................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allentown Mack Sales & Service, Inc. v. NLRB*,
  522 U.S. 359 (1998)..................................................................24

*Alves v. Commissioner*,
  79 T.C. 864 (1982), *aff'd*, 734 F.2d 478 (9th Cir. 1984)...................40

*Alves v. Commissioner*,
  734 F.2d 478 (9th Cir. 1984) .................................................36, 40

*American Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001).................................................33

*Association of Data Processing Service Organizations Inc. v. Board
  of Governors of the Federal Reserve System*,
  745 F.2d 677 (D.C. Cir. 1984).................................................24

*Austin v. Commissioner*,
  141 T.C. 551 (2013)..................................................35, 43, 48

*Bagley v. Commissioner*,
  85 T.C. 663 (1985), *aff'd per curiam*, 806 F.2d 169 (8th Cir. 1986)................38

*Bowen v. American Hospital Ass'n*,
  476 U.S. 610 (1986)...............................................................25

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
  419 U.S. 281 (1974)...............................................................24

*Brice v. Virginia Beach Correctional Center*,
  58 F.3d 101 (4th Cir. 1995) ................................................37, 39, 47

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)...............................................................24

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)..........................................................23, 24, 30

**Page(s)**

*Clapp v. Commissioner*,
875 F.2d 1396 (9th Cir. 1989) .........................................................31

*Cohen v. United States*,
650 F.3d 717 (D.C. Cir. 2011) .........................................................21

*Collins Music Co. v. United States*,
21 F.3d 1330 (4th Cir. 1994) ..........................................................21

*Davis v. Commissioner*,
716 F.3d 560 (11th Cir. 2013) ............................................35, 36, 38

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006).........................................................................32

*Etheridge v. Norfolk & Western Railway Co.*,
9 F.3d 1087 (4th Cir. 1993) ............................................................32

*Ewing v. Commissioner*,
122 T.C. 32 (2004), *rev'd, vacated by* 439 F.3d 1009
(9th Cir. 2006).................................................................................29

*Farrell v. Commissioner*,
136 F.3d 889 (2d Cir. 1998) ...........................................................16

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................................................................5, 24

*FCC v. NextWave Personal Communications Inc.*,
537 U.S. 293 (2003).........................................................................33

*Fisher v. Commissioner*,
45 F.3d 396 (10th Cir. 1995) ..........................................................25

*Florida Power & Light Co. v. Lorion*,
470 U.S. 729 (1985).........................................................................31

*Mayo Foundation for Medical Education & Research v. United
States*,
562 U.S. 44 (2011)...............................................................17, 20, 33

**Page(s)**

*Montelepre Systemed, Inc. v. Commissioner*,
  61 T.C.M. (CCH) 1782 (1991), *aff'd*, 956 F.2d 496 (5th Cir. 1992) ..........36, 42

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State
  Farm Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983) .................................................................................24, 25, 27

*O'Dwyer v. Commissioner*,
  266 F.2d 575 (4th Cir. 1959) ...........................................................................31

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014) ......................................................................................33

*Ohio River Valley Environmental Coalition, Inc. v. Kempthorne*,
  473 F.3d 94 (4th Cir. 2006) ..............................................................................25

*Qingyun Li v. Holder*,
  666 F.3d 147 (4th Cir. 2011) ............................................................................32

*Raheja v. Commissioner*,
  725 F.2d 64 (7th Cir. 1984) ..............................................................................31

*Robinette v. Commissioner*,
  439 F.3d 455 (8th Cir. 2006) ............................................................................32

*Robinson v. United States*,
  335 F.3d 1365 (Fed. Cir. 2003) ........................................................................43

*SEC v. Chenery Corp.*
  318 U.S. 80 (1943).............................................................................................25

*United States v. Byrum*,
  408 U.S. 125 (1972)...........................................................................................48

*United Technologies Corp. v. United States Department of Defense*,
  601 F.3d 557 (D.C. Cir. 2010)..........................................................................26

*Waterman v. Commissioner*,
  179 F.3d 123 (4th Cir. 1999) ............................................................................20

**Page(s)**

**STATUTES**

5 U.S.C. § 551(1) ............................................................5, 21

5 U.S.C. § 551(1)(H) ...........................................................21

5 U.S.C. § 551(6) ...............................................................22

5 U.S.C. § 551(13) .............................................................22

5 U.S.C. § 553 ....................................................................6

5 U.S.C. § 554 ....................................................................6

5 U.S.C. § 559 ................................................................6, 29

5 U.S.C. § 703 ...................................................................29

5 U.S.C. § 706 ....................................................................6

5 U.S.C. § 706(2) ............................................................6, 23

5 U.S.C. § 706(2)(A) ...........................................................14

26 U.S.C. § 83 .................................................................1, 3

26 U.S.C. § 83(a) ...............................................................34

26 U.S.C. § 83(a)(2) ........................................................34, 38

26 U.S.C. § 83(c)(2) ............................................................34

26 U.S.C. § 83(h) ...............................................................34

26 U.S.C. § 6212 ..................................................................6

26 U.S.C. § 6212(c)(1) .........................................................22

26 U.S.C. § 6213(a) .........................................................1, 6, 22

26 U.S.C. § 6213(c) ..........................................................7, 22

26 U.S.C. § 6214 ..................................................................1

**Page(s)**

26 U.S.C. § 7442 ..................................................................................1

26 U.S.C. § 7482(a) .............................................................................1

26 U.S.C. § 7517 ..................................................................................7

26 U.S.C. § 7522 ................................................................................30

26 U.S.C. § 7522(a) .......................................................................7, 30

## OTHER AUTHORITIES

Internal Revenue Manual (2013),
   https://www.irs.gov/irm/part8/irm_08-017-004.html#d0e1790 ........26

Rev. Rul. 2007-49, 2007-2 C.B. 237 ..................................................39

Tax Court Rule 91 ...............................................................................15

Treas. Reg. § 1.83-1(a)(1) ..................................................................44

Treas. Reg. § 1.83-2(a) .......................................................................39

Treas. Reg. § 1.83-3(c)(1) .............................................................42, 46

## STATEMENT OF JURISDICTION

On March 26, 2013, the Internal Revenue Service issued a Notice of Deficiency to QinetiQ US Holdings Inc. & Subsidiaries (QinetiQ).  JA 21.  On June 24, 2013, QinetiQ filed a timely petition in the Tax Court challenging the deficiency.  JA 6; *see* 26 U.S.C. § 6213(a).  The Tax Court had jurisdiction over that petition under 26 U.S.C. §§ 6213(a), 6214, and 7442.

The Tax Court entered final judgment in the case on July 6, 2015.  JA 2273.  QinetiQ filed a timely notice of appeal on October 2, 2015.  JA 2274.  This Court has jurisdiction under 26 U.S.C. § 7482(a).

## STATEMENT OF ISSUES

1.     Whether the Notice of Deficiency issued in this case, in which the Internal Revenue Service rejected a tax deduction of $117 million without a single word of explanation, should be vacated for failure to comply with the bedrock requirements of the Administrative Procedure Act.

2.     Whether stock issued to a company employee at the time he signs his employment contract is equity compensation covered by 26 U.S.C. § 83, where the company explicitly reserves the right to buy back the stock at a price well below its fair market value if the employee stops working at the company.

# INTRODUCTION

This tax case raises two issues on appeal.  The first is whether a Notice of Deficiency issued by the Internal Revenue Service (IRS or Service) is subject to the requirements of the Administrative Procedure Act (APA), just like any other agency action not expressly exempted from the APA by law.  If the APA does apply—as it must by the Act's terms—then the Notice of Deficiency at issue must be set aside because it contains no reasoned explanation at all for denying the roughly $117 million deduction claimed by the taxpayer, petitioner-appellant QinetiQ U.S Holdings, Inc. & Subsidiaries (QinetiQ).  The second issue, which this Court need only reach if it concludes that the Notice of Deficiency is somehow valid under the APA, is whether the taxpayer is entitled to a deduction under 26 U.S.C. § 83 for equity compensation paid to an employee.  The Tax Court held that the APA was inapplicable and that QinetiQ is not entitled to the deduction at issue. The Tax Court was wrong on both counts.

The events giving rise to this case stem from a small-business success story. In 2002, Julian Chin agreed to join Dominion Technology Resources, Inc., a government contracting company.  In exchange, Chin received just shy of 50 percent of the voting shares of the company's stock.  At the time, the shares had a par value of ten cents a share (which Chin paid), but they represented a substantial economic stake in the company—a common form of executive compensation—and

strong incentive to remain at the company. Chin took the stock on the express condition that, if Chin left the company for any reason at all over the next 20 years, he would be required to offer the stock back to the company at a price well below its market value. Six years later, DTRI was acquired by QinetiQ for $123 million. As part of that sale, DTRI released the restrictions on Chin's stock, enabling him—for the first time—to sell the stock free of restrictions, which he then did.

After he sold the stock, Chin—the only employee whose compensation is directly at issue in this appeal—reported the full value of his stock on his 2008 federal income tax return as ordinary income, as required by Section 83 of the Internal Revenue Code. *See* 26 U.S.C. § 83. That provision states that when an employee receives property in connection with services he has provided (or will provide) to his employer, he must report the full value of the property in his income tax return *in the first year in which the property is no longer subject to a substantial risk of forfeiture* (2008, for Chin). Section 83 further authorizes the employer to take the same amount as a deduction on its corporate income tax return, which is what QinetiQ did after it acquired the company and stepped into its shoes for the tax question presented by this case.

The IRS rejected QinetiQ's corporate return on the ground that QinetiQ was not entitled to a deduction under Section 83. Why? The Notice of Deficiency did not say. Unlike a standard Notice of Deficiency, QinetiQ's Notice of Deficiency

did not explain the IRS's *reasons* for denying the deduction, even after QinetiQ had made lengthy submissions with the Service explaining why it was entitled to the deduction under Section 83. All the Notice stated was that the IRS had determined that QinetiQ was not entitled to the deduction. Period.

QinetiQ brought suit in the Tax Court, claiming both that the Notice of Deficiency was invalid under the APA because it failed to provide any reasoned explanation for the IRS's determination, and that the IRS's summary conclusion that QinetiQ was not entitled to the deduction was wrong. The Tax Court disagreed, holding that Notices of Deficiency are categorically exempt from the APA, and that QinetiQ was not entitled to the deduction. That was error.

The APA broadly, and unambiguously, applies to agency action, and broadly, and unambiguously, requires any agency action to be accompanied by a reasoned explanation. In creating a tax-specific exemption from the APA, the Tax Court ignored the text of the APA entirely. But, as the terms of the APA make clear, only *Congress* can create exemptions from the APA's requirements. And Congress has not done so for Notices of Deficiencies. The APA therefore plainly applies to the Notice of Deficiency at issue and, because that Notice provides no explanation whatever for its perfunctory conclusion, the APA requires that the Notice be set aside. The Court need go no further in resolving this appeal.

In any event, the Tax Court also erred in concluding that QinetiQ is not entitled to the deduction at issue. The Tax Court's finding that the stock Chin received when he agreed to work for the company was not transferred in connection with the performance of services defies common sense and is impossible to reconcile with the stipulated facts. Moreover, the court's conclusion that the stock was not subject to a substantial risk of forfeiture is based on a hindsight analysis that is contradicted by the agency's own regulations and ignores the numerous specified ways in which the stock could be forfeited. Accordingly, even if the Court concludes that the APA does not require vacatur of the Notice of Deficiency at the outset, the Tax Court's decision still must be reversed.

## STATEMENT OF THE CASE

### A.    Statutory Background

"The Administrative Procedure Act . . . sets forth the full extent of judicial authority to review executive agency action for procedural correctness . . . ." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Originally enacted in 1946, it applies broadly to federal agencies, with "agency" defined (with certain narrowly drawn exceptions not applicable here) to include "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1). The APA not only describes the procedures by which the executive agencies within its ambit are to carry out their

assigned work, *see, e.g.*, *id.* §§ 553-554, but also supplies the standards that courts are to apply in reviewing the results of those agencies' efforts, *see id.* § 706.

Section 706 of the APA provides that "[a] reviewing court shall . . . hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." *Id.* § 706(2). Section 559 of the APA provides that those judicial review provisions "do not limit or repeal additional requirements imposed by statute or otherwise recognized by law," and further states that a "[s]ubsequent statute may not be held to supersede or modify" the judicial review provisions of the APA "except to the extent that it does so expressly." *Id.* § 559.

The particular form of agency action at issue in this case is a Notice of Deficiency, issued by the IRS under 26 U.S.C. § 6212. That provision states that, where the Service "determines that there is a deficiency in respect" of a taxpayer's payment of certain taxes, the Service may send a Notice of Deficiency to the taxpayer notifying the taxpayer of that identified deficiency. 26 U.S.C. § 6212. Once the Notice of Deficiency has issued, the IRS can assess and collect the amount of tax identified in the Notice unless the taxpayer brings suit in the Tax Court within 90 days challenging the deficiency. *See id.* § 6213(a), (c).

The "Miscellaneous Provisions" chapter of the Internal Revenue Code (Code) provides that the Notice of Deficiency "shall describe the basis for, and identify the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice." *Id.* § 7522(a). That section, which was added to the Code in 1988, further provides that "[a]n inadequate description under the preceding sentence shall not invalidate such notice." *Id.* The "Miscellaneous Provisions" chapter also imposes separate explanatory obligations on the Service, to which the "shall not invalidate" sentence, by its terms, does not apply. *See id.* § 7517 (requiring the Service to explain how it arrived at a particular valuation of property for estate and gift taxes).

Nothing in Section 7522, the Code's "Miscellaneous Provisions," or the Code more broadly, exempts Notices of Deficiency from the APA.

## B. Factual Background

### 1. *TGH And DTRI*

Thomas Hume (Hume) formed Thomas G. Hume, Inc. (TGH) in March 2002 in Virginia to provide government contracting services in the defense, aerospace, and security field. JA 245 ¶ 24; JA 2245-46. Hume and his wife, Karyn Hume, were the initial directors of TGH, and Hume reported his ownership of 5,000 shares of TGH stock in a tax filing later that month. JA 246 ¶ 30; JA 466.

7

In November 2002, Hume sought to amend the corporate structure of TGH in connection with the hiring of a new executive, Julian Chin, to help run the company.  JA 247 ¶¶ 35-36; JA 468-70.  Hume's law firm identified the following steps needed to effect these changes: (1) amending the name of the corporation to Dominion Technology Resources, Inc. (DTRI), (2) amending the Articles of Incorporation, and (3) authorizing 20,000 new shares of stock to replace the existing stock.  *Id.*  The memorandum also referenced Hume and Chin's agreement to "share 75% of the voting common shares as 'founders'" (with Hume owning approximately 51 percent and Chin owning approximately 49 percent), and the company's right to repurchase their shares "upon termination of employment for any . . . reason [other than death] would be at a nominal value."  JA 468, 470.  The law firm then sent Hume the corresponding documents.  JA 247 ¶¶ 37-38.

Thomas and Karyn Hume, as directors of TGH, filed Articles of Amendment on December 6, 2002 to officially change the company's name and to authorize the issuance of new shares of stock.  *Id.* ¶ 39.  The Articles of Amendment increased the previously authorized 5,000 shares of common stock to 20,000 shares of common stock divided into two classes:  15,000 Class A voting common stock (Class A shares) and 5,000 Class B non-voting common stock (Class B shares).  JA 248 ¶ 40.  The Class A and Class B shares were equal in economic value, but the Class B shares were non-voting shares.  *Id.*, JA 250 ¶ 50.

8

Hume and Chin each paid DTRI $450, representing the par value of the Class A and Class B DTRI stock to be transferred to them—$0.10 per share. JA 250 ¶¶ 49-50.  DTRI's Board of Directors then issued a Consent on December 12, 2002, authorizing (i) the transfer of Class A and Class B shares to Hume and Chin, (ii) a shareholders agreement with Hume and Chin (Shareholders Agreement), and (iii) separate employment agreements with each of Hume and Chin (collectively, the Employment Agreements).  JA 250-52 ¶¶ 51-57; JA 503-07.

On December 18, 2002, DTRI entered into the Shareholders Agreement with Hume and Chin, entered into the Employment Agreements with Hume and Chin, and issued stock certificates to Hume and Chin.  JA 253 ¶ 63, 256-57 ¶¶ 71, 76. DTRI issued 4,500 Class A shares to Hume and 4,455 Class A shares and 45 Class B shares to Chin.  JA 251 ¶ 55, 254 ¶ 65; JA 543-45.  This gave Hume and Chin equal economic shares in DTRI, but gave Hume 50.25 percent of the voting power and Chin only 49.75 percent of the voting power.  JA 253 ¶ 62.  Hume became the President and Chief Executive Officer of DTRI, while Chin became the Executive Vice President and Chief Operating Officer.  JA 257 ¶ 74.

## 2.  *Restrictions Imposed On Employee Stock*

The Shareholders Agreement accompanying this corporate change contains several restrictions on the transferability of Hume's and Chin's stock.  The objective of these restrictions was "to limit the ownership of the Stock to

Shareholders who are employees of the Corporation" to ensure "continuity of harmonious management." JA 254 ¶¶ 66, 68. The Shareholders Agreement provides that a shareholder who "terminates his employment with the Corporation with or without cause, or whose employment with the Corporation is terminated by the Corporation with or without cause, shall be deemed to have offered to sell all of his Stock to the Corporation for the Agreement Price." JA 254-55 ¶ 68.

The Agreement Price is a steeply discounted price that varies based on years of service and the circumstances surrounding the shareholder/employee's departure. For example, if Chin had voluntarily left the company without competing with DTRI, the Shareholders Agreement provides that the Agreement Price is computed by discounting the value of the shares "by five percent (5%) for every full year of service . . . less than twenty (20) years." JA 255 ¶ 69; JA 515. If Chin left the company to *compete* with DTRI or if Chin had been terminated for cause, the Shareholders Agreement provides that the price of the shares would be the lesser of the price calculated above or "twenty five percent (25%) of the [paragraph 6 value of the employee's shares]." JA 255-56 ¶ 69; JA 516. The Shareholders Agreement further restricted the total value of the Class A and Class B shares issued to Hume and Chin to four times the company's earnings before extraordinary bonuses to officers, interest, taxes, depreciation, and amortization (EBITDA) for the prior fiscal year. JA 253 ¶ 64; JA 515 ¶ 6.

10

The stock certificates incorporate by reference the restrictions found in the Shareholders Agreement. The back of each certificate bears a legend that states "[t]he sale and/or transfer of this stock is restricted in accordance with the provisions of a Shareholders Agreement dated effective the __ day of _____, 2002, a copy of which is filed in the corporate book." JA 257-58 ¶¶ 76-77; JA 543-45.

DTRI's By-Laws also expressly authorized such restrictions, providing that "[t]he shareholders may restrict the transfer of stock between themselves through written agreement." JA 248 ¶¶ 46-48, JA 486. In addition, the By-Laws provide that Hume and Chin could not dispose of their shares in the corporation other than by "gift, bequest, or intestacy or to a trust for the benefit of the shareholder, or spouse or lineal descendants, without first giving the corporation and all other shareholders written notice of their intention to make such disposition, and further providing DTRI and its shareholders with a right of first refusal." JA 249 ¶ 48.

### 3. *Sale Of DTRI To QinetiQ*

In January 2008, QinetiQ, a defense services company, approached DTRI about acquiring the company. JA 270-71 ¶¶ 153-54. After extensive negotiations, QinetiQ, its subsidiary (Project Black Acquisition Corporation), and DTRI signed the final Agreement and Plan of Merger, under which QinetiQ agreed to pay $123 million for all of the outstanding stock of DTRI. JA 274 ¶¶ 169-70.

11

On September 3, 2008, Hume, in his capacity as sole remaining Director of DTRI, and all of the voting shareholders of DTRI executed a Consent in Lieu of a Special Meeting of the Board of Directors and Voting Shareholders of DTRI. JA 275 ¶ 173; JA 1841-96. This consent acknowledges that certain shares of DTRI stock were subject to various express restrictions. *Id.* The consent further states that these restrictions constitute a substantial risk of forfeiture. JA 275 ¶ 174.

On October 17, 2008, DTRI's Board of Directors and voting shareholders entered into three additional Consents in Lieu of a Special Meeting. The First Consent (executed by the Board) states that DTRI had entered into a merger agreement providing for the exchange of all outstanding shares of DTRI stock for cash. JA 276 ¶ 177. This consent waived all of DTRI's rights with respect to the stock transfer restrictions. JA 277 ¶ 181. The Second Consent (executed by the voting shareholders) authorized the waiver of the Class A Shareholders' rights with respect to the stock transfer restrictions. JA 278 ¶ 185. And the Third Consent (executed by the Board) stated that certain employees of DTRI had been granted Class B restricted common stock that remained only partially vested. JA 279 ¶ 188. The consent also provided that these shares were to be vested immediately before the transaction closed. *Id.*

The transaction closed on October 17, 2008, at which point QinetiQ acquired all of the outstanding shares of DTRI. *Id.* ¶ 190, JA 1664-1840.

12

### 4.    *Tax Reporting Of Stock At Issue*

Hume and Chin filed timely personal income tax returns for the 2002 through 2006 tax years. Their returns reported allocations and distributions of profits and losses from the DTRI stock, which were also reported by DTRI for those same tax years. *See* JA 243 ¶¶ 15-16, 263-64 ¶¶ 109-12; JA 2275-740. Chin did not report the value of any portion of the stock issued to him by DTRI as wages for federal income tax purposes during those years. JA 243 ¶ 16.

On its consolidated federal income tax return for its year ended March 31, 2009, QinetiQ reported a deduction for equity-based compensation relating to the release of restrictions imposed on the Class A and Class B common stock of DTRI. JA 279-80 ¶ 191. A portion of that—$117,777,501—was related to the DTRI stock issued to Hume and Chin in 2002, representing the purchase price paid for such stock by QinetiQ. *Id*. Consistent with this deduction, Hume and Chin reported their respective shares of the $117,777,501 as ordinary income from wages on the tax returns they filed for the taxable year ended December 31, 2008. JA 244 ¶ 21.[1]

_____

[1]   Hume and Chin have filed protective refund claims for the 2008 taxable year as a result of the Commissioner's proposed disallowance of QinetiQ's claimed salary and wage deduction at issue here. JA 244 ¶ 22. Those claims assert that if the Commissioner's position in this litigation is correct, then Hume and Chin overpaid their 2008 taxes by $11,011,381 and $11,259,241, respectively. JA 244-45 ¶ 22. That difference reflects the fact that they paid tax on the stock sale as ordinary income, but that under the Commissioner's theory, they would be entitled

## C.    Procedural History

On March 26, 2013, the IRS issued a Notice of Deficiency to QinetiQ, asserting a $13,902,087 deficiency.   JA 240 ¶ 5.   The Notice stated: "It is determined that the deduction you claimed for Salaries and Wages in the amount of $117,777,501 under the provisions of IRC § 83 is disallowed in full as you have not established that you are entitled to such a deduction." *Id.* ¶ 7(a).  The IRS had informally made various arguments about the appropriateness of QinetiQ's deduction during the preceding audit of QinetiQ, and QinetiQ had responded to those arguments in various filings.   But the Notice of Deficiency provided no explanation of *how*, or *why,* the Service had arrived at its final determination.[2]

QinetiQ challenged the Notice of Deficiency in the Tax Court.  At the outset, QinetiQ moved that the Tax Court should dismiss the Notice of Deficiency under Section 706 of the APA, given the absence of any reasoned explanation in the Notice of Deficiency.  5 U.S.C. § 706(2)(A).  In a four-page order, the Tax Court rejected that argument, holding both that Notices of Deficiency are categorically

---

to pay tax on the sale proceeds at the lower long-term capital gain rate. *Id.* ¶¶ 21-22.

[2]   The Notice of Deficiency, which is reproduced at JA 21-40, stated similarly conclusory "determinations" for other matters not at issue here and contained various computations implementing the IRS's determinations.

exempt from the APA's requirements and that the Notice did not need to state anything more than the Service's *conclusion*. JA 235-38.[3]

Both parties then sought summary judgment on the availability of the deduction under Section 83. QinetiQ argued that it was entitled to a deduction as to Chin's stock, but withdrew its claim as to Hume's. *See* JA 1927-35; JA 1936-40a.[4] The government, meanwhile, sought partial summary judgment not on the applicability of Section 83 itself but instead on an affirmative defense known as the "duty of consistency," arguing that even if Section 83 did apply to the Chin stock, the prior erroneous treatment of that stock as outstanding on Chin's and DTRI's returns would preclude QinetiQ's deduction. *See* JA 1941-46; JA 1947-49. The Tax Court denied both parties' summary judgment motions without written opinion. *See* JA 1950-59; JA 1960-66.

After the Tax Court's summary judgment decision, QinetiQ and the government agreed that the case could be resolved on the basis of the documentary evidence and a completely stipulated record, without the need for a trial.[5] That

---

[3]   The Tax Court also denied a summary judgment motion the government had filed in connection with its response to QinetiQ's motion. *See* JA 238.

[4]   QinetiQ expressly preserved its argument that the Notice of Deficiency was invalid under the APA as to both Hume's and Chin's stock. *See* JA 1940a.

[5]   Under Tax Court Rule 91, "[t]he parties are required to stipulate, to the fullest extent to which complete or qualified agreement can or fairly should be reached, all matters not privileged which are relevant to the pending case." "This stipulation process has been called 'the bedrock of Tax Court practice,' and is

agreement was consistent with the Tax Court's earlier order "that the parties shall attempt to fully stipulate the facts of this case." JA 238. The Tax Court ruled in favor of the government, holding that Chin's stock did not come within Section 83. JA 2243-72. Because it concluded that Section 83 did not apply, the Tax Court did not reach the IRS's duty of consistency argument.

In holding that QinetiQ was not entitled to a deduction, the Tax Court first concluded that the stock was not transferred in connection with the performance of services based on the fact that Chin paid the par value of the stock ($450) in 2002 and based on certain representations that Chin and others had made about their rights in the stock. JA 2263-64. Next, the Tax Court concluded that the stock was not subject to a substantial risk of forfeiture based on a hindsight analysis of events after Chin joined the company, and concluded that Chin was able to exercise certain ownership rights in connection with his 2002 stock grant (such as the right to vote) that were more extensive than the rights extended in other equity compensation packages the company used. JA 2269.

QinetiQ filed this timely appeal. JA 2274.

---

considered 'largely responsible for the court's ability to keep current with the thousands of cases docketed each year.'" *Farrell v. Commissioner*, 136 F.3d 889, 893 (2d Cir. 1998) (citations omitted). Accordingly, while less common in federal district court, the use of a stipulated record is commonplace in the Tax Court.

## SUMMARY OF ARGUMENT

The Tax Court made two errors in granting judgment for the IRS in this case, either one of which independently warrants reversal.

I. The first, and most basic, error came in holding that the APA does not apply to the review of IRS Notices of Deficiency at all—even though the IRS is clearly subject to the APA and Notices of Deficiency are clearly the sort of agency action for which the APA prescribes standards of review. In holding otherwise, the Tax Court ignored the text of the APA, and ignored that Congress has never exempted Notices of Deficiencies from the APA. It illogically concluded that the Tax Court's general practice of reviewing Notices of Deficiency under a *de novo* standard of review prevented it from holding that the Notice was arbitrary and capricious given the lack of reasoned explanation. And it erroneously believed that existing precedent settled the *in*applicability of the APA to Notices of Deficiency.

The Supreme Court itself has made clear that courts are not free "to carve out an approach to administrative review good for tax law only." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 55 (2011). But that is precisely what the Tax Court did here, in exempting the Notice of Deficiency from the APA's basic requirements for all agency action.

When reviewed under the APA, as it must be, it is clear that the Notice of Deficiency here should be vacated. It is a bedrock principle of the APA, and

17

administrative law more generally, that an agency must explain any action that has concrete legal effects on a regulated party. Agency action that does not contain such reasoning is the epitome of arbitrary and capricious. The Notice of Deficiency here contained only an *ipsit dixit* conclusion and no explanation at all. Accordingly, this Court should reverse the Tax Court's decision and remand with instructions to vacate the Notice of Deficiency. The IRS is no more entitled to "do overs" when it plainly violates federal law than are taxpayers.

II. The Tax Court also erred in holding that QinetiQ (acting as new corporate parent of DTRI) was not entitled under Section 83 of the Code to deduct the value of the stock Chin had received upon beginning his employment at DTRI, at the time the restrictions on that stock were lifted. Under Section 83, the value of stock is deductible by the employer when it was (1) transferred in connection with an employee's performance of services, and (2) subject to a substantial risk of forfeiture until the tax year in which the employer seeks to take the deduction. The stipulated record, which both parties agreed made a live trial unnecessary, clearly established that both of those conditions were met as to Chin's stock.

As to the first condition, Chin received his stock on the same day he signed his Employment Agreement, and (until the restrictions on the stock were released) would have substantially forfeited the value of that stock if he *stopped* working for DTRI after less than 20 years. The price he would have been paid for his stock in

the event he quit or was fired was expressly tied to the length of his tenure at DTRI in order to encourage Chin to stay with the company and reward him for his services. Thus, the stock was plainly connected to his performance of services. None of the other considerations cited by the court precludes that conclusion.

As to the second condition, the record was also clear. In order to retain his stock without forfeiture, Chin had to keep working for DTRI—a so-called "earnout" provision that the Tax Court has previously recognized creates a substantial risk of forfeiture. Chin was a minority shareholder with no power to modify that provision on his own, and nothing in the record even *hinted* that DTRI would have hesitated to enforce it against him if he decided to stop working at the company. To avoid that conclusion the Tax Court engaged in a hindsight analysis that is contradicted by the IRS's own regulations and erroneous as a matter of law.

Because the Tax Court clearly erred in holding that QinetiQ is not entitled to the deduction at issue, this Court should reverse the Tax Court's decision on the merits (if it does not resolve this appeal on the first issue) and remand the case to the Tax Court to consider the duty of consistency issue in the first instance.

## STANDARD OF REVIEW

This Court reviews decisions of the Tax Court on the same basis it reviews decisions from a civil bench trial in a district court: Questions of law are reviewed

19

*de novo*, while questions of fact generally are reviewed for clear error. *See Waterman v. Commissioner*, 179 F.3d 123, 126 (4th Cir. 1999).

## ARGUMENT

### I.   THE NOTICE OF DEFICIENCY MUST BE SET ASIDE BECAUSE IT FAILS TO MEET A CENTRAL REQUIREMENT OF THE APA

The first question presented by this case is whether the APA applies to tax deficiency notices—an issue of fundamental importance. The Tax Court answered that question in the negative, holding that it is "well settled that the APA does not apply to deficiency cases" before it. JA 236. But however "settled" in the Tax Court, that position simply cannot be squared with the statute. The text of the APA leaves no room for the tax exemption that the Tax Court has written into it, and the Supreme Court has made clear that courts are not free "to carve out an approach to administrative review good for tax law only." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 55 (2011). Evaluated—as it must be— under the basic requirements that the APA sets for nearly all agency action, the Notice of Deficiency here is plainly invalid and, therefore, must be vacated.

### A.   The APA Plainly Applies To The Notice Of Deficiency

The question whether the APA applies to the Notice of Deficiency ultimately turns on two issues under the APA. First, is the IRS covered by the APA's definition of "agency"? And, second, is a Notice of Deficiency an "agency action" under the APA? The statute's terms unambiguously answer both questions

in the affirmative. And none of the other considerations identified by the Tax Court provides any basis for disregarding the APA's plain terms.

To begin with, there can be no dispute that the APA applies to the IRS—an executive agency. As noted above, the APA applies broadly to "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," exempting only Congress, the courts, the governments of federal territories and possessions and the District of Columbia, agencies composed of representatives of the parties to the disputes determined by them, and certain forms of military authority. 5 U.S.C. § 551(1). Congress has, over time, also designated certain specific *functions* that are exempted from the APA's definition of agency, *see id.* § 551(1)(H), but none of the exempt functions pertains to actions of the Service or the Department of the Treasury.

This is not news. In *Collins Music Co. v. United States*, this Court held that "[t]he propriety and extent of judicial review of the action of an agency such as the IRS is determined by reference to the Administrative Procedure Act." 21 F.3d 1330, 1335 (4th Cir. 1994) (footnote omitted). More recently, the District of Columbia Circuit has rejected the Service's requests for special treatment, holding that "[t]he IRS is not special" and that "no exception exists shielding it—unlike the rest of the Federal Government—from suit under the APA." *Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) (en banc).

21

The text of the APA likewise makes clear that a Notice of Deficiency is "agency action" subject to review under the APA. Section 551 of the APA provides that "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," and further defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(13), (6).

A Notice of Deficiency plainly falls within that definition. The Notice of Deficiency is the IRS's "final disposition" of a taxpayer's tax liability. If the taxpayer does not challenge the Notice of Deficiency in court, the IRS is authorized to assess and collect the amount of tax determined in the Notice. *See* 26 U.S.C. § 6213(c). And if the taxpayer does challenge the Notice of Deficiency, the IRS is barred by statute (with limited exceptions not applicable here) from assessing any additional tax liability against the taxpayer in connection with the taxable year to which the Notice of Deficiency applies until a final decision of the Tax Court is issued. *See id.* §§ 6212(c)(1), 6213(a).

There can be no doubt that the Notice of Deficiency is subject to the APA.

### B.    The Notice Of Deficiency At Issue Flunks The APA Because It Fails To Provide Any Reasoned Explanation

Because the Notice of Deficiency is "agency action" within the meaning of the APA, it is subject to the standards set forth in the APA. It flunks them.

22

1.   Section 706 of the APA subjects agency action to six distinct standards of judicial review.  The first four standards apply in every case, while the statute limits the remaining two to specific scenarios.  Specifically, Section 706 states:

> The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > (B) contrary to constitutional right, power, privilege, or immunity;
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> >
> > (D) without observance of procedure required by law;
> >
> > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> >
> > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

Tracking its text, the Supreme Court has held that Section 706 "provides that a 'reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions' found not to meet six separate standards."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413 (1971) (alteration in original).  "*In all cases*," the Court explained, "agency action must be set aside if the action was [1] 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet [2] statutory, [3] procedural, *or* [4]

constitutional requirements." *Id.* at 413-14 (emphases added). The arbitrary-and-capricious standard is the broadest of these standards—"a catchall, picking up administrative misconduct not covered by the other more specific paragraphs." *Association of Data Processing Serv. Orgs. Inc. v. Board of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

Because the six separate standards look to separate things and apply "cumulative[ly]," courts often apply multiple standards in a single case. *Id.* But the Supreme Court has made clear that the arbitrary-and-capricious standard is a "separate standard[]" that must be met in every case, even if the other standards, like the substantial-evidence standard, are met. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 284 (1974) (citation omitted); *see also*, *e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998).

2.   A bedrock component of the APA's arbitrary-and-capricious standard is "the requirement that an agency provide reasoned explanation for its action." *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 515 (2009). It is well-settled that an agency may not just announce a conclusion and demand compliance with that conclusion from the public, but instead must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v.*

*United States*, 371 U.S. 156, 168 (1962)); *see also Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 626 (1986) ("It is an axiom of administrative law that an agency's explanation of the basis for its decision must include 'a rational connection between the facts found and the choice made.'" (quoting *Motor Vehicle Ass'n*, 463 U.S. at 43)); *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006) (rejecting agency action where agency failed to provide a "reasoned explanation" for its decision).

Among other things, an explanation is necessary to give the taxpayer notice of the *grounds* on which the IRS has based its determination, not just the *fact* of the deficiency itself. As the Tenth Circuit has held, "[i]t is not enough that [the Commissioner's] decision could have been, or even probably was, based on sound reasons" if the Notice of Deficiency does not set forth those reasons as the basis for the Commissioner's decision. *Fisher v. Commissioner*, 45 F.3d 396, 397 (10th Cir. 1995). "The IRS cannot make taxpayers haul it into Tax Court to ascertain that it has ruled on a lawful request or to discover what the rationale for its decision is." *Id.*; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (administrative order must state reasons for agency's decision).

3.  Many if not most Notices of Deficiency provide a detailed explanation of the IRS's reasons for reaching its conclusion. Indeed, the Internal Revenue Manual provides guidance to revenue agents about how to draft an explanation

25

that satisfies the two purposes of a Notice of Deficiency—"to inform the taxpayer in clear and concise language of the adjustment; and . . . to state the position or positions of the Service with respect to the adjustments being made."  Internal Revenue Manual 8.17.4.13(1) (2013), https://www.irs.gov/irm/part8/irm_08-017-004.html#d0e1790.  It provides, for example, that a Notice of Deficiency should "not describe an item as a 'deduction' and then disallow it because it does not qualify as an allowable deduction" and should "[n]ever use code citations as the only explanations for disallowance."  *Id.* at 8.17.4.13.2(4), 8.17.4.13.3(1)(A).

In contrast to those ordinary Notices of Deficiency, which explain in "clear and concise" language the basis for the IRS's position, the Notice of Deficiency here lacked any reasoned explanation at all.  The entire statement for the Commissioner's decision to deny QinetiQ's claimed deduction under Section 83 and thereby increase QinetiQ's taxable income by nearly $118 million was as follows:  "It is determined that the deduction you claimed for Salaries and Wages in the amount of $117,777,501 under the provisions of IRC §83 is disallowed in full as you have not established that you are entitled to such a deduction.  Accordingly, taxable income is increased $117,777,501."  That is it.  It is settled law that such "[a] naked conclusion . . . is not enough."  *United Techs. Corp. v. United States Dep't of Def.*, 601 F.3d 557, 565 (D.C. Cir. 2010).

26

The IRS has pointed out that there were tax forms attached to the Notice of Deficiency. But those forms, too, did not provide any explanation for the agency's reasons for denying the deduction—they just showed the numerical adjustments triggered by the denial of the deduction. The IRS has also pointed out that QinetiQ had previously gone through a contested audit, in which the IRS did provide an explanation for its determination of deficiency. But agencies change, limit, or expand their reasoning for acting all the time, and the Notice of Deficiency did not in any way refer to or attempt to incorporate the arguments that the IRS had previously made. Nor did it attempt to respond to QinetiQ's positions. The Notice simply contained no explanation at all for the final determination it reached.

The Tax Court nevertheless believed that the Notice of Deficiency "served its purpose by notifying the petitioner that a deficiency *had been determined* and giving the petitioner the opportunity to petition this Court for redetermination of the proposed deficiency." JA 236 (emphasis added). But that is pure *ipsit dixit*. And if that were the standard by which agency actions were judged, agency action would *never* be arbitrary and capricious. To pass muster, the agency would need only say, "We have determined to do X (or deny your request for *Y*), and if you don't like it, sue us." The APA was enacted to prevent just such arbitrary-and-capricious agency action. *See*, *e.g.*, *State Farm*, 463 U.S. at 43 (requiring the agency to provide a "satisfactory explanation for its action").

27

## C.     None Of The Other Considerations Cited By The Tax Court Provides Any Reason For Excusing This Statutory Violation

In its four-page order, the Tax Court made no meaningful attempt to reconcile its holding that "the APA does not apply to deficiency cases in this Court," JA 236, with the actual text of the APA or with Supreme Court precedent concerning its application to agency determinations.  Instead, the Tax Court asserted three reasons—apart from the APA's text—as to why, in its view, the APA does not apply to the Notice of Deficiency.  None has any merit.

First, the Tax Court stated that the arbitrary-and-capricious standard could not apply to a Notice of Deficiency, because for "more than 85 years," the Tax Court has "review[ed] deficiency determinations de novo."  *Id.*  But the Tax Court does not have the power to abrogate the APA.  Nor does the Tax Court's past practice of disregarding the APA provide any basis for this Court to ignore the APA in a case, such as this, where the taxpayer has invoked the APA.

In any event, the fact that the Tax Court applies a *de novo* review standard to the *result* of the agency's determination does not somehow abrogate the APA's separate requirement to provide a reasoned explanation for its determination.  For example, if the Service indiscriminately sent out thousands of identical Notices of Deficiency—each baldly asserting an unexplained deficiency of $1 million—in the hope that some taxpayers would fail to respond, a taxpayer who received such a Notice would be free to challenge it as arbitrary and capricious for failure to

28

provide any explanation without having to engage in expensive litigation before the Tax Court over what its proper tax liability should have been. The taxpayer, like any citizen who is the subject of an adverse agency action subject to the APA, is entitled to an explanation from the government so it can assess the validity of the agency's action, and evaluate the bases for challenging that action.

Second, the Tax Court reasoned that, "[a]s a statute of general application, the APA does not supersede specific statutory provisions for judicial review." JA 237 (quoting *Ewing v. Commissioner*, 122 T.C. 32, 50 (2004) (Thornton, J., concurring), *rev'd, vacated by* 439 F.3d 1009 (9th Cir. 2006)). But while the APA provides that Chapter 7—which contains the APA's standards of judicial review— "do[es] not limit or repeal *additional* requirements imposed by statute or otherwise recognized by law," it further provides that a "[s]ubsequent statute may not be held to supersede or modify . . . chapter 7 . . . *except to the extent that it does so expressly*." 5 U.S.C. § 559 (emphases added). Likewise, the APA expressly contemplates that its standards for review will apply in proceedings brought under more specific statutes: it provides that a principal "form of proceeding for judicial review" contemplated by the APA "is the special statutory review proceeding relevant to the subject matter in a court specified by statute." *Id.* § 703.

Congress can, to be sure, provide that some or all of the APA's standards will be inapplicable to any particular category of case. But the default rule against

which Congress legislates is that, *"[i]n all cases* agency action must be set aside if the action was 'arbitrary [and] capricious.'" *Citizens to Preserve Overton Park*, 401 U.S. at 413-14 (emphasis added) (citation omitted). Congress legislated against that rule when it enacted the requirements for a Notice of Deficiency in 26 U.S.C. § 7522, and it made no exception to the APA, which was enacted decades before Section 7522 and which Congress is therefore presumed to have been aware of when it enacted Section 7522. Section 7522 simply sets forth "additional requirements" that a Notice of Deficiency must meet; it does not override the requirements that all agency action must meet under the APA.

The Tax Court cited 26 U.S.C. § 7522 for the proposition that "we do not hold a notice invalid just because it is succinct." JA 236. But even the Tax Court did not suggest that Section 7522 expressly displaces the APA's arbitrary-and-capricious standard. For good reason. Section 7522 provides only that a failure to comply *with Section 7522* "shall not invalidate such notice." 26 U.S.C. § 7522(a) ("An inadequate description *under the preceding sentence* shall not invalidate such notice." (emphasis added)). Section 7522 does not purport to have any effect whatsoever on requirements imposed by other provisions of law, let alone expressly state that it is displacing the requirements of the APA.

Third, the Tax Court cited three Court of Appeals decisions arising in other contexts for the proposition that "[i]t is well settled that the APA does not apply to

deficiency cases in this Court."  JA 236.  But none of those cases can sustain the weight the Tax Court placed on them.  The first two cases—*Clapp v. Commissioner*, 875 F.2d 1396 (9th Cir. 1989), and *Raheja v. Commissioner*, 725 F.2d 64 (7th Cir. 1984)—are not from this Circuit, and therefore are not binding. Moreover, those cases do not even *mention* the APA, let establish that it is "well settled that the APA does not apply to deficiency cases."  JA 236.

The third case—*O'Dwyer v. Commissioner,* 266 F.2d 575, 580 (4th Cir. 1959)—is circuit precedent and at least mentions the APA, but its result is premised on a rationale that the Supreme Court has expressly repudiated.  In *O'Dwyer,* this Court held that review under what is now Section 706 is available only where the agency proceeded under the APA's provisions for formal adjudication, reasoning that without formal adjudication there would be no "whole record" for the reviewing court to consider.  *Id.* at 580.  Because the Service was not required to use formal adjudication, the Court concluded that there would be no "whole record" for the Tax Court to review, and therefore held that "[t]he Tax Court is not subject to the Administrative Procedure Act."  *Id.*

The Supreme Court, however, abrogated that line of reasoning more than thirty years ago in *Florida Power & Light Co. v. Lorion*, where the Court held that "[t]he APA specifically contemplates judicial review on the basis of the agency record compiled in the course of informal agency action in which a hearing has not

occurred." 470 U.S. 729, 744 (1985). That presumably explains why the Service did not rely on *O'Dwyer* below. Moreover, in other cases, the Service has affirmatively *criticized O'Dwyer*, calling the decision "poorly reasoned" and stating that the *O'Dwyer* "court made the flawed assumption that the judicial review provisions of the APA apply only to formal agency action, and not informal agency action." Reply Brief for the Appellant, *Robinette v. Commissioner*, No. 04-360 (8th Cir. March 2005), *available at* 2005 WL 5627779. In *Robinette v. Commissioner,* the Eighth Circuit agreed, holding that *O'Dwyer* "was premised on a now-outmoded understanding that informal agency action cannot be reviewed based on an administrative record." 439 F.3d 455, 461 (8th Cir. 2006).

Accordingly, *O'Dwyer* is no longer good law in light of subsequent Supreme Court decisions applying the standards of Section 706 to review of informal agency proceedings, and therefore cannot support the Tax Court's decision here.[6]

In the area of patent law, the Supreme Court has repeatedly rejected the Federal Circuit's attempts to carve out patent-specific rules that contravene the general principles enacted by Congress and not expressly exempted for patent cases. *See, e.g., eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-92 (2006);

---

[6]  A panel is not bound by prior Circuit precedent that has been overridden by Supreme Court precedent. *See, e.g., Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011) (recognizing that a prior decision is "no longer controlling" where "a subsequent Supreme Court decision 'specifically rejected the reasoning on which [the prior decision] was based'" (alteration in original) (quoting *Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090-91 (4th Cir. 1993))).

32

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1758 (2014). In effect, the Tax Court committed the same error here, carving out a tax-specific exception to the APA, never contemplated by Congress, and, indeed, expressly rejected by Congress in Section 559 of the APA. The Code sets forth *additional* requirements for Notices of Deficiency. But Section 7522 does not create any exemption from the bedrock requirements—including the requirement of a reasoned explanation—that Congress prescribed for all "agency action" in the APA. And courts are not free simply "to carve out an approach to administrative review good for tax law only." *Mayo*, 562 U.S. at 55.

## D.    Because The Notice Of Deficiency Is Invalid Under The APA, It Must Be Vacated

The remedy in a case such as this one is likewise clear. As the Supreme Court has admonished, "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (citation omitted); *see also American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (A party who "prevails on its APA claim . . . is entitled to relief under that statute, which normally will be a vacatur . . . ."). Accordingly, if the Court agrees that the APA applies and that the Notice of Deficiency fails to meet its requirements, then the Notice must be set aside. At a minimum, tax liability may not be imposed on the basis of that invalid Notice.

## II.     THE TAX COURT INDEPENDENTLY ERRED IN HOLDING THAT QINETIQ WAS NOT ENTITLED TO THE DEDUCTION

The Tax Court also erred in concluding that QinetiQ was not entitled to the deduction at issue.  Section 83 of the Internal Revenue Code provides the "General rule" for the tax treatment of property—including stock and stock options—that is transferred "in connection with the performance of services."  26 U.S.C. § 83(a).  It provides that where a taxpayer receives such property in connection with services that he or she has performed, is performing, or will perform for the transferor, the *taxpayer* must include the fair market value of the property (minus "the amount (if any) [the taxpayer] paid for such property") in his or her gross income "in the first taxable year in which the rights of the person . . . in such property are . . . not subject to a substantial risk of forfeiture."  *Id.* § 83(a)(2).[7]

Section 83(h) further provides for the tax treatment of the property by the *employer* who receives the services, entitling the employer to a deduction equal to the amount the employee is required to include in his or her income.  *Id.* § 83(h) ("[T]here shall be allowed as a deduction under section 162, to the person for

---

[7]     The requirement that the value of the property be included in gross income is also triggered when the rights become "transferable," 26 U.S.C. § 83(a), but the statute provides that "[t]he rights of a person in property are transferrable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture," *id.* § 83(c)(2).  Here, Section 2 of the Shareholders Agreement provides that all transferees are subject to the same terms as the initial recipient, collapsing the transferability analysis and substantial risk of forfeiture analysis into a single inquiry.  *See* JA 512.

whom were performed the services in connection with which such property was transferred, an amount equal to the amount included . . . in the gross income of the person who performed such services."); *see also, e.g.*, *Davis v. Commissioner*, 716 F.3d 560, 572 (11th Cir. 2013) (holding that corporate officer should have reported exercise of stock option as income under Section 83, and therefore approving corporation's deduction of the value of the stock).

The determination whether an employer is entitled to a deduction under Section 83 turns on two requirements grounded in the statute's text. The first asks whether the property—stock, here—was transferred "in connection with the performance of services." The second looks to whether the property was subject to a "substantial risk of forfeiture." *See Austin v. Commissioner*, 141 T.C. 551, 559-60 (2013). As explained next, both requirements are met here, and QinetiQ's deduction should therefore have been allowed.

## A. The Stock Clearly Was Transferred In Connection With The Performance Of Services

In deciding whether property was transferred "in connection with the performance of services," courts have looked to a number of factors, including:

> (1) Whether the property right is granted at the time the employee . . . signs his employment contract; (2) whether the property restrictions are linked explicitly to the employee's . . . tenure with the employing company; (3) whether the consideration furnished by the employee . . . in exchange for the transferred property is services; and (4) the employer's intent in transferring the property.

*Montelepre Systemed, Inc. v. Commissioner*, 61 T.C.M. (CCH) 1782, 1786 (1991), *aff'd*, 956 F.2d 496 (5th Cir. 1992).  No single factor is dispositive.  In addition, courts have emphasized that in assessing the applicability of Section 83 in any given case, the inquiry must remain directed broadly toward whether "property [was] transferred 'in connection with . . . services,' not just [as] compensation for employment."   *Alves v. Commissioner*, 734 F.2d 478, 482 (9th Cir. 1984) (omission in original); *see also Davis*, 716 F.3d at 566 ("§ 83 . . . encompasses more transfers than just those made as compensation").

### 1.     *Chin's Stock Was Granted At The Time He Signed His Employment Contract And Was Explicitly Linked To Chin's Tenure At DTRI*

The Tax Court correctly recognized that the first two factors are present. *See* JA 2262.   First, the stock was issued on the day that Chin signed the Employment and Shareholders Agreements, and the restrictions on it were expressly linked to Chin's tenure at DTRI.  *See* JA 253 ¶ 63, 256 ¶ 71, 257 ¶ 76. The Shareholders Agreement (which was incorporated by reference on the stock certificates) expressly provides that a shareholder who "terminates his employment with the Corporation with or without cause, or whose employment with the Corporation is terminated with or without cause, shall be deemed to have offered to sell all of his Stock to the Corporation for the Agreement Price."  JA 254-55 ¶ 68.  Likewise, the Agreement sets forth a formula for determining the Agreement

36

Price that depends in large part on the length of Chin's service at DTRI at the time of his departure and the circumstance under which his employment ended.

### 2.    *Chin's Employment Served As Consideration For The Stock*

The Tax Court thought it "less evident" that the third and fourth factors were present in this case, and ultimately held that they weighed against QinetiQ. JA 2263.  That was clear error, "induced by an erroneous view of the controlling legal standard."  *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 106 (4th Cir. 1995) (citation omitted).  Looking first to whether Chin had offered his services as an employee of the company as consideration for the stock, the Tax Court mistakenly treated as conclusive the fact that Chin had deposited $450 into a bank account before the stock was issued—as though the $450 par value paid at the time of issuance was intended to be the *complete* consideration furnished for this stock sold for tens of millions of dollars six years later.  *See* JA 2263.

Section 83, however, expressly covers circumstances in which taxpayers pay some amount below fair market value for property that is transferred in connection with the performance of services, including the situation where stock is sold to employees who buy it recognizing the potential if not likelihood that the value of the stock will increase (along with that of the company) if the services are successful.  Indeed, Section 83(a)(2) explicitly provides that the fair market value of the property has to be reduced by "the amount (if any) paid for such property,"

26 U.S.C. § 83(a)(2), thus recognizing a payment may already have been made for the property. Stock incentives, including shares of stock worth little to nothing at the outset, are a common form of compensation for executives in start-up companies. Thus, the fact that Chin paid $450 for the stock does nothing to establish that his past and future services were not also consideration for the stock.

Moreover, the stock and related corporate documents make clear that the stock was tied to *the performance of services.* Under the terms of the Shareholders Agreement, the price that DTRI would pay Chin for his stock if he left was based on Chin's years of service. Even assuming that the company's overall market capitalization remained constant, Chin was entitled to twice as much for his stock if he stayed two years as he would be if he left after one year, three times as much if he stayed for three years, four times as much if he stayed four years, and so on. Given the stock restriction's focus on Chin's continued work for the company, the Tax Court's conclusion that Chin did not offer his services as consideration for the stock could only have been induced by its erroneous view that an employee's monetary payment for stock—however nominal—is considered the primary consideration for that stock. But that view is erroneous as a matter of law. *See Davis*, 716 F.3d at 568 (where stock is issued to "ensure [an officer's] continued involvement with the company, . . . the presence of additional benefits or motivating factors does not alter the nature of the option grant"); *Bagley v.*

*Commissioner*, 85 T.C. 663, 665-66 (1985) (holding that stock is issued in connection with the performance of services when it is issued to retain the services of the employee), *aff'd per curiam*, 806 F.2d 169 (8th Cir. 1986); *see also Brice*, 58 F.3d at 106 (court commits clear error where its factual finding is "induced by an erroneous view of the controlling legal standard" (citation omitted)).

Even if the $450 had represented the full fair market value of the stock at the time of the purchase, moreover, the stock would still have been transferred "in connection with" the performance of services because the only reason Chin was allowed to purchase the stock was his status as a DTRI employee.  So long as the employee is able to purchase stock only because of his provision of services (rather than on the same terms as any other member of the public), the applicable regulations provide that "[t]he fact that the transferee has paid full value for the property transferred, realizing no bargain element in the transaction, does not preclude the use of the election as provided for in this section."  Treas. Reg. § 1.83-2(a); *see also* Rev. Rul. 2007-49, 2007-2 C.B. 237, 238 (recognizing that Section 83 applies "even if the employee pays fair value").  In other words, even if the employee paid the full market value for the stock, the regulations provide that it is still transferred in connection with services if the only reason the employee was able to buy the stock was that he worked for the company, as was true here.

The Tax Court's earlier decision in *Alves* is on point. 79 T.C. 864 (1982), *aff'd*, 734 F.2d 478 (9th Cir. 1984). The taxpayer there paid full fair market value for his shares (not the kind of token par value that Chin paid for the shares at issue here), and argued on that basis that Section 83 did not apply. But the Tax Court disagreed, holding that the shares were nevertheless transferred "in connection with the performance of services by him for the company" because the company had sold stock only to "individuals who had been approached with respect to becoming employees or officers of the company" and who "did, in fact, all become company officials." *Id.* at 872-73.

The Ninth Circuit affirmed, expressly noting that the company had "issued stock only to its officers, directors, and employees, with the exception of the shares sold to the underwriter." 734 F.2d at 481. In sharp contrast with the Tax Court here, the Ninth Circuit found it immaterial whether the taxpayer had purchased the stock as an "entrepreneurial investment," JA 2263, because "Congress intended section 83 to apply [even] to taxpayers like Alves who allege that they purchased restricted stock as an investment." *Alves*, 734 F.2d at 482. So too here.

### 3. DTRI Intended To Tie Chin's Equity Stake To His Continued Provision Of Services For The Company

The Tax Court also clearly erred in finding that the fourth factor—the employer's intent—was absent here. The Tax Court reasoned that QinetiQ could not "speak with certainty to DTRI's intent." JA 2264. But the documentary

40

evidence surrounding DTRI's issuance of the stock says everything one would need to know about this factor: the Shareholders Agreement indicated the company's express intent to "limit the ownership of the Stock to Shareholders who are employees of the Corporation," and to that end provided that a shareholder who ceased to work at DTRI would "be deemed to have offered to sell all of his Stock to the Corporation for the Agreement Price." JA 254-55. And, again, the price Chin would be paid for his stock if he left depended on how long he had been working at DTRI at that point. The longer he worked at DTRI, the more he would be paid for his stock—an unmistakable indication that DTRI intended the stock to encourage Chin's continued provision of services to the company.

Accordingly, all *four* of the factors the Tax Court looked to clearly support a finding that the stock was transferred in connection with Chin's provision of services. And even if the Tax Court had been correct that one or two of those factors pointed less strongly toward the application of Section 83 than QinetiQ maintained, taken as a whole the circumstances still clearly demonstrate that Chin received the stock in connection with his performance of services: He received the stock at the time he signed his employment contract, could not have obtained the stock without agreeing to work for DTRI, and had no right to keep the stock if he *stopped* working for DTRI. Given that "the statute only envisions *some* sort of relationship between the services performed and the property transferred,"

41

*Montelepre Systemed, Inc.*, 61 T.C.M. (CCH) at 1786 (emphasis added), there was no reasonable way to look at the evidence in this case and conclude otherwise.

Indeed, even the Tax Court ultimately appeared to recognize the shaky ground on which its contrary conclusion rested. After concluding "that petitioner has failed to prove the Chin stock was transferred in connection with the performance of services pursuant to section 83," it observed that, "[n]onetheless, in this matter we believe the crux of our section 83 analysis is whether the Chin stock was subject to a substantial risk of forfeiture." JA 2266. As explained next, however, the Tax Court erred in its analysis of that prong as well.

## B.  The Stock Clearly Was Subject To A Substantial Risk Of Forfeiture

The Tax Court recognized the two facts that should have made its resolution of the substantial-risk-of-forfeiture prong straightforward. First, it acknowledged that "[s]hares of stock are subject to a substantial risk of forfeiture when the owner's rights to their full enjoyment are conditioned upon the future performance of substantial services by any individual." JA 2266; *see also* Treas. Reg. § 1.83-3(c)(1). And second, it found that the Shareholders Agreement provided that if Chin stopped working at DTRI—whether voluntarily, as a result of a disability, or because he was fired without cause—the company had the right to buy back his stock at significantly below its fair-market value. JA 2249-50.

42

Taken together, those facts make it clear that Chin's stock was subject to a substantial risk of forfeiture: unless Chin continued to work at DTRI, he had no right even to continue to own the stock, let alone to enjoy it fully. Such scenarios, in which an employee faces the "partial forfeiture of . . . ownership rights in the event of early termination of . . . employment," *Robinson v. United States*, 335 F.3d 1365, 1366 (Fed. Cir. 2003), are a classic example of the substantial risk of forfeiture that Section 83 requires. *See Austin v. Commissioner*, 141 T.C. 551, 559-60 (2013) (recognizing that "an earnout restriction will normally create a 'substantial risk of forfeiture'" under Section 83 (citation omitted)).

In finding otherwise, the Tax Court made two simple but fundamental errors.

### 1. *The Fact That Chin Treated The Stock As His Own Does Not Mean That He Was Not At Risk Of Losing It*

First, the Tax Court apparently believed that because Chin had paid $450 for the stock and treated the stock as outstanding for corporate purposes, including accepting distributed income and losses, *see* JA 2264-65, the stock could not have been subject to a substantial risk of forfeiture, *see* JA 2270-72. But this analysis overlooks the express restrictions placed on the stock. Moreover, forfeiture necessarily contemplates losing something that is already owned. So any indication that Chin owned the stock is hardly fatal to finding a risk of forfeiture—it is *necessary* to QinetiQ's showing on this point. Treasury Regulations also

explicitly anticipate that employees may receive income on property that remains subject to a substantial risk of forfeiture.  *See* Treas. Reg. § 1.83-1(a)(1).

The Tax Court's contrary conclusion would be like saying that a homeowner who is two years behind on his mortgage payments does not have a substantial risk of forfeiture because he continues to occupy his house up until the day the foreclosure notice arrives, or continues to accept rental income from the tenants to whom he has rented the home.  The fact that a taxpayer continues to treat his own property as his own before forfeiture does not mean that he is not at risk of losing it in the future if he does not live up to his contractual obligations.[8]  Here, if Chin had left the company to work for a competitor or was fired, the stock was explicitly subject to forfeiture at less than fair market value.

The Tax Court's error seems to have flowed from its comparison between the terms on which DTRI provided stock to Chin, a senior executive, in 2002 and the terms on which DTRI provided stock to employees more broadly (including Chin) in subsequent years.  Specifically, the Tax Court noted that "the subsequent issuances of class B common nonvoting stock were issued subject to restricted stock grants" that "explicitly provide[d] guidelines for the treatment of such stock both before and after vesting."  JA 2271.  Before those other stock grants vested,

---

[8]    That does not mean that a substantial risk of forfeiture *always* exists.  The property must still be subject to restrictions that create the risk of forfeiture.

the employees had "no rights as a shareholder of DTRI," and shares of unvested stock were held by DTRI until they were fully vested.  *Id.*  (citation omitted).

But those differences do not erase, or diminish, the restrictions on Chin's stock, which themselves triggered Section 83.  DTRI simply used two different forms of equity compensation, each calibrated to the circumstances in which it was invoked.  In providing shares to Chin in 2002 to ensure "harmonious management" and give Chin significant incentives to remain at the company for 20 years or more, it opted to transfer the shares in full, subject to forfeiture of much of the stock's value in the event Chin left the company.

By contrast, in looking to create equity incentives for employees more broadly after the company was up and running, DTRI used what was essentially a five-year option contract—employees had the option to obtain stock by continuing to work at DTRI for five years, but would not own the stock outright until they had done so.  The fact that DTRI transferred an option contract (rather than the shares themselves) to its employees in some circumstances has no bearing on whether, when DTRI transferred the stock itself to Chin in other circumstances, that stock was subject to forfeiture.  Nor does the use of an option contract for other employees negate the restrictions that were placed on Chin's stock until 2008.

In short, this first ground for the Tax Court's conclusion that there was no substantial risk of forfeiture was plainly invalid.

## 2.     *The Tax Court Clearly Erred In Engaging In A Hindsight Analysis Of What Risks Were Substantial*

Second, the Tax Court also found that there was no substantial risk of forfeiture because QinetiQ "failed to show proof of the likelihood of enforcement of the forfeiture provisions on the Chin stock."  JA 2272.  In finding that enforcement was unlikely, however, the Tax Court focused on developments that could only have occurred *after* the transfer, noting that "Hume and Chin had a very close work relationship," that "together they built the company from its early stages of incorporation," and that "Chin voted on all company matters and helped determine the company's overall direction."  JA 2269.[9]

That kind of hindsight analysis is flawed as a matter of law.  The applicable regulations provide that "[p]roperty is not transferred subject to a substantial risk of forfeiture if *at the time of transfer* the facts and circumstances demonstrate that the forfeiture condition is unlikely to be enforced."  Treas. Reg. § 1.83-3(c)(1) (emphasis added).  Moreover, the Tax Court's approach is illogical.  Even if an employee's strong performance alleviates the risk of forfeiture, that does not mean

---

[9]     The Tax Court cited no evidence that supported these ostensible findings, and the record makes clear that the third such "finding," at least, was not true: Chin was not a Director, and therefore did not "vote on all company matters."  As explained in the text, however, these factual assertions by the Tax Court should be rejected for the more fundamental reason that, even if true, they do not speak to the (legally relevant) risk of enforcement at the time the transfer was made in 2002.

the risk was absent in the first place, because there was a risk that the employee's performance would *not* live up to employer expectations.

Making matters worse, the Tax Court's erroneous view of the legal standard again led it to a clearly erroneous factual finding that the record cannot support. *See Brice*, 58 F.3d at 106. Based on DTRI's post-2002 success, the Tax Court found it "unlikely that Hume would have taken any actions to terminate [Chin's] employment." JA 2269. To state the obvious, the history of small businesses is filled with examples of business fortunes or relationships that have gone south even after the best of intentions and rosiest of forecasts. Moreover, even assuming that Chin would not have been fired (an assumption that could only make sense in hindsight), there were numerous other circumstances which would have forced Chin to forfeit his shares back to DTRI at below-market prices.

For example, if Chin had gone to work for a competitor, or simply decided that he preferred long afternoons on the porch to long days in the office, he would have been deemed to offer the stock back to DTRI at a price far below its fair-market value. And while the Tax Court found that QinetiQ "failed to provide any evidence of the method of recourse intended to recover any nonvested Chin stock in the event that Chin violated the terms of the shareholders agreement," JA 2271, that finding of omission is patently false: the Shareholders Agreement *itself* prescribed the method of recourse, which was for DTRI to purchase the stock back

from Chin at a price pegged far below its market value, *see* JA 254-56 ¶¶ 68-69. To take a concrete example, if Chin had quit in 2008 before the sale, DTRI could have bought his stock back from him for less than $3 million.[10] By staying at the company until DTRI agreed to lift the stock restrictions in connection with the sale to QinetiQ (which valued the company at more than 20 times EBITDA, rather than the 4 times EBITDA used for the Agreement Price), Chin instead received nearly $60 million for that same stock.

The Tax Court itself has recognized that the possibility that an employee will stop working for some reason or another is not so remote as to make it an "event that is unlikely to occur" for purposes of the Section 83 risk-of-forfeiture analysis. *See, e.g.*, *Austin*, 141 T.C. at 566-67. Indeed, if that scenario came to pass, Hume would have owed a fiduciary duty to the other minority shareholders to exercise DTRI's purchase right. *See United States v. Byrum*, 408 U.S. 125, 137-38, 142 (1972) (corporate officer and majority shareholder owes fiduciary duty to corporation and its shareholders, and minority shareholders may bring shareholder action to force compliance with such duty).

In short, the restrictions set forth in the Shareholders Agreement itself made it absolutely clear that Chin's stock was subject to a substantial risk of forfeiture. The fact that, with the benefit of hindsight, it is possible to say that a forfeiting

---

[10] As noted, Chin owned less than half the company, and DTRI's book income in 2007 was $3,958,038. *See* JA 804.

48

event did not occur in no way precludes the conclusion that Chin's shares were subject to a substantial risk of forfeiture when they were issued.[11]

---

[11] The Tax Court also noted that QinetiQ had shown enforcement of restrictions on Class B stock, but "failed to demonstrate that DTRI had ever enforced any restrictions in connection with class A common voting stock." JA 2271. That signifies nothing. DTRI treated the restrictions on Class A and Class B shares similarly, releasing *both* in preparation for the QinetiQ merger. *See* JA 278-79. QinetiQ had never enforced the restrictions on the Class A stock because only two people—Chin and Hume—held it, and the government did not contend that the circumstances triggering the restrictions on that stock had ever occurred. The absence of evidence about past enforcement is meaningless in circumstances where the restrictions never *could* have been enforced. Moreover, this is another example of the Tax Court's legally flawed hindsight approach.

# CONCLUSION

The judgment of the Tax Court should be reversed.  If the Court concludes that the APA applies and the Notice of Deficiency fails to comply with the APA, then the Court should remand the case with instructions to vacate the Notice of Deficiency.  The tax may not be imposed on the basis of an invalid Notice.  If the Court decides that the Notice of Deficiency was somehow immune from review under the APA or could survive APA review, the Court should reverse the Tax Court's Section 83 ruling, and remand the case to allow the Tax Court to address the Commissioner's duty of consistency argument.

January 21, 2016                          Respectfully submitted,

                                          /s/ Gregory G. Garre
                                          Gregory G. Garre
                                          Gerald A. Kafka
                                          Benjamin W. Snyder
                                          Nicolle Nonken Gibbs
                                          LATHAM & WATKINS LLP
                                          555 Eleventh Street, NW
                                          Suite 1000
                                          Washington, DC 20004
                                          (202) 637-2207

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

Counsel for Petitioner-Appellant QinetiQ U.S. Holdings, Inc. & Subsidiaries hereby certifies that:

1. This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The Brief contains 12,647 words (as calculated by the word processing system used to prepare this brief), excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This Brief complies with the type face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The Brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman style font.

Dated: January 21, 2016

Respectfully Submitted,

s/ Gregory G. Garre
Gregory G. Garre
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

*Counsel for Petitioner-Appellant QinetiQ U.S. Holdings, Inc. & Subsidiaries.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of January, 2016, the foregoing Brief for Appellant QinetiQ U.S. Holdings, Inc. & Subsidiaries was filed with the clerk's office for the United States Court of Appeals for the Fourth Circuit and served on counsel of record via the Court's CM/ECF system.

s/ Gregory G. Garre
Gregory G. Garre

**STATUTORY ADDENDUM**

## TABLE OF CONTENTS

**Description**                                                                                          **Page**

5 U.S.C. § 706 ................................................................................................ ADD-1

26 U.S.C. § 83 ............................................................................................... ADD-2

# 5 U.S.C. § 706

## § 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**26 U.S.C. § 83**

**§ 83. Property transferred in connection with performance of services**

**(a) General rule**

If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

**(b) Election to include in gross income in year of transfer**

**(1) In general**

Any person who performs services in connection with which property is transferred to any person may elect to include in his gross income, for the taxable year in which such property is transferred, the excess of—

(A) the fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse), over

(B) the amount (if any) paid for such property.

If such election is made, subsection (a) shall not apply with respect to the transfer of such property, and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture.

ADD-2

**(2) Election**

An election under paragraph (1) with respect to any transfer of property shall be made in such manner as the Secretary prescribes and shall be made not later than 30 days after the date of such transfer. Such election may not be revoked except with the consent of the Secretary.

**(c) Special rules**

For purposes of this section—

**(1) Substantial risk of forfeiture**

The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

**(2) Transferability of property**

The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture.

**(3) Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934**

So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are—

(A) subject to a substantial risk of forfeiture, and

(B) not transferable.

(4) For purposes of determining an individual's basis in property transferred in connection with the performance of services, rules similar to the rules of section 72(w) shall apply.

**(d) Certain restrictions which will never lapse**

**(1) Valuation**

In the case of property subject to a restriction which by its terms will never lapse, and which allows the transferee to sell such property only at a price

determined under a formula, the price so determined shall be deemed to be the fair market value of the property unless established to the contrary by the Secretary, and the burden of proof shall be on the Secretary with respect to such value.

**(2) Cancellation**

If, in the case of property subject to a restriction which by its terms will never lapse, the restriction is canceled, then, unless the taxpayer establishes—

(A) that such cancellation was not compensatory, and

(B) that the person, if any, who would be allowed a deduction if the cancellation were treated as compensatory, will treat the transaction as not compensatory, as evidenced in such manner as the Secretary shall prescribe by regulations,

the excess of the fair market value of the property (computed without regard to the restrictions) at the time of cancellation over the sum of—

(C) the fair market value of such property (computed by taking the restriction into account) immediately before the cancellation, and

(D) the amount, if any, paid for the cancellation,

shall be treated as compensation for the taxable year in which such cancellation occurs.

**(e) Applicability of section**

This section shall not apply to—

(1) a transaction to which section 421 applies,

(2) a transfer to or from a trust described in section 401(a) or a transfer under an annuity plan which meets the requirements of section 404(a)(2),

(3) the transfer of an option without a readily ascertainable fair market value,

(4) the transfer of property pursuant to the exercise of an option with a readily ascertainable fair market value at the date of grant, or

(5) group-term life insurance to which section 79 applies.

**(f) Holding period**

In determining the period for which the taxpayer has held property to which subsection (a) applies, there shall be included only the period beginning at the first time his rights in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier.

**(g) Certain exchanges**

If property to which subsection (a) applies is exchanged for property subject to restrictions and conditions substantially similar to those to which the property given in such exchange was subject, and if section 354, 355, 356, or 1036 (or so much of section 1031 as relates to section 1036) applied to such exchange, or if such exchange was pursuant to the exercise of a conversion privilege—

    (1) such exchange shall be disregarded for purposes of subsection (a), and

    (2) the property received shall be treated as property to which subsection (a) applies.

**(h) Deduction by employer**

In the case of a transfer of property to which this section applies or a cancellation of a restriction described in subsection (d), there shall be allowed as a deduction under section 162, to the person for whom were performed the services in connection with which such property was transferred, an amount equal to the amount included under subsection (a), (b), or (d)(2) in the gross income of the person who performed such services. Such deduction shall be allowed for the taxable year of such person in which or with which ends the taxable year in which such amount is included in the gross income of the person who performed such services.